# BURSEY *v.* LYON.

---

EJECTMENT; SOURCE OF TITLE; JUDICIAL RECORDS; PARTITION.

1. Where the plaintiff in ejectment in this District does not show that he and the defendant claim under a common source of title, it is incumbent upon him to show a complete chain of title from the sovereign, either the English Crown, the State of Maryland, or the United States,—especially where neither he nor any person under whom he claims was ever in possession of the property.

2. The plaintiff in ejectment must prove a legal title to the premises in himself at the time of the demise laid in the declaration, and evidence of an equitable estate will not be sufficient for a recovery.

3. The plaintiff in ejectment cannot rely upon the weakness of the defendant's title, but must recover on the strength of his own title.

4. When an officer or commissioner, acting under authority of law and in accordance with its forms, conveys to an individual a tract of land owned by the government, the conveyance will pass only such title as the government has therein; and there is no greater presumption of law that the title is valid than if it had been derived from an individual proprietor.

5. Whether the certificates of allotment issued to the original proprietors of the land now comprising the District of Columbia after they had conveyed their land in trust in order that the Federal city might be laid off, operated as conveyances of the fee from the government to the original proprietors of the lots described therein, or whether they

operated merely as releases of the trust so as to revest title in the proprietors, a plaintiff in ejectment seeking to recover land so allotted, and tracing title from such a proprietor, must go beyond the certificate, and show that the proprietor himself originally had the title.

6. A final decree in the proceeding *in rem*, such as a suit for partition, rendered by a court of competent jurisdiction, imports absolute verity, and cannot be attacked by supposed lack of evidence to support it, or for supposed lack of necessary parties before the court, but can be impeached only for fraud on the part of the party procuring the decree, and not in a collateral proceeding.

7. Where an order of the court in a partition proceeding (many of the records of which have been lost) ratifying the report of commissioners appointed to make the partition, shows that commissioners were appointed to make partition of the estate of a decedent among his heirs at law, and the report of the commissioners shows that they divided the property among the parties named in the report as the heirs at law of the decedent, who were the same parties referred to in the decree for partition as the heirs at law of the decedent, and it is conceded that the court had jurisdiction over the subject-matter and the parties before it, it will be presumed not only that the court had the proper parties before it, but that the parties to whom the estate was portioned by the report of the commissioners were the legal heirs of the decedent.

No. 1828.    Submitted February 19, 1908.    Decided March 13, 1908.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia, upon a verdict directed by the court in an action of ejectment.      *Reversed.*

The facts are stated in the opinion.

*Mr. William H. White* for the appellant.

*Mr. Isaac S. Lyon,* appellee, appeared in proper person.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

This is an action of ejectment brought in the supreme court of the District of Columbia to recover possession of an un-

divided one-half of the north half of lot 7, in square 834, in the city of Washington. When appellee Isaac S. Lyon, plaintiff below, rested his case, appellant, Isaac B. Bursey, hereafter referred to as defendant, moved the court to instruct a verdict for the defendant for the reason, "first, that the testimony for the plaintiff did not show a record title from the sovereignty to the plaintiff; second, that the testimony did not show that either plaintiff or any person under whom he claimed had ever been in possession of the real estate in litigation; and, third, that plaintiff's declaration claimed the whole of the property in litigation, and the deeds under which he claimed did not purport to convey more than a one-half undivided interest in said property." While this motion was pending, counsel for defendant announced that he intended to stand on his motion. At this point, counsel for plaintiff asked leave to amend his declaration to include an undivided half interest in the land involved in this suit, instead of the whole interest. This motion was granted, and an amended declaration was filed. The court then denied the motion of defendant, and also an instruction requested by defendant to return a verdict in his favor. The jury returned a verdict for the plaintiff for the possession of an undivided one-half of the north half of said lot 7. From the judgment rendered thereon, defendant prosecutes this appeal, and assigns error as follows: "The trial court erred: (1) In admitting in evidence the certificate of division of lots in square 834; (2) in admitting in evidence book 3 of the record of squares of the surveyor's office, showing said certificate; (3) in admitting in evidence the papers and docket entries in cause 82, Partitions and book J. A. S. No. 1, pages 529 *et seq;* (4) in admitting in evidence the various deeds, as follows, (a) William Prout to Nathaniel Brady, (b) Nathaniel Brady to William S. Walker; (5) in overruling defendant's motion to instruct the jury to return a verdict for defendant."

It is urged by counsel for defendant that it does not appear that either the plaintiff or any person under whom he claimed has ever been in possession of the land in controversy. Having failed to establish a common source of title, it was incumbent

upon plaintiff to show a complete chain of title from the sovereign, either the English crown, the State of Maryland, or the United States. We are impressed with the force of this objection, since it is conceded that neither the plaintiff nor any person under whom he claims title was ever in possession of the lot in question.

It appears that on December 23, 1788, the assembly of Maryland offered to cede to Congress any territory within her limits, not exceeding 10 miles square, which might be selected for the seat of government. On December 3, 1789, Virginia made a similar offer, and Congress, on July 16, 1790, accepted the offer of Maryland in connection with that of Virginia. Burch's Digest, 213, 225. The act of Congress of July 16, 1790 [1 Stat. at L. 130, chap. 28], providing for the establishment of a permanent seat of government, authorized the President to appoint three commissioners, who should, under his direction, survey and "by proper metes and bounds define and limit a district of territory, under the limitations above mentioned; and the district so defined, limited, and located shall be deemed the district accepted by this act for the permanent seat of the government of the United States." Burch's Digest, 225. The original territory embraced within the District of Columbia was accordingly selected, surveyed, and boundary lines established. As a part of the arrangement, and to carry into effect the cession act of Maryland, nineteen of the original proprietors of lands within the limits of the original city of Washington met and signed an agreement on March 30, 1791, which, among other things, provided that "we, the subscribers, in consideration of the great benefits we expect to derive from having the Federal city laid off upon our lands, do hereby agree and bind ourselves, our heirs, executors, and administrators, to convey, in trust to the President of the United States, or commissioners, or such other persons as he shall appoint, by good and sufficient deeds in fee simple, the whole of our respective lands which he may think proper to include within the lines of the Federal city for the purposes and on the conditions following: The President shall have the sole power of directing the Federal city to be laid off in what manner he pleases. He may retain

any number of squares he may think proper for public improvements, or other public uses, and the lots only which shall be laid off shall be a joint property between the trustees in behalf of the public and each present proprietor. And the same shall be held and equally divided between the public and the individuals as soon as may be after the city shall be laid off. For the streets, the proprietors shall receive no compensation; but for the squares, or lands in any form, which shall be taken for public buildings, or any kind of public improvements or uses, the proprietors, whose lands are taken, shall receive at the rate of twenty-five pounds per acre, to be paid by the public." *Van Ness* v. *Washington,* 4 Pet. 278, 7 L. ed. 857.

Afterwards, pursuant to this agreement, on June 29, 1791, these original proprietors conveyed for this purpose all their lands by deeds of trust to two trustees, Thomas Beall and John M. Gantt. These deeds are all in the same form and contain the same declarations of trust. They provide, among other things, that "in consideration of the uses and trusts hereinafter mentioned, to be performed by the said Beall and Gantt, and the survivor of them, and the heirs of such survivor, according to the true intent and meaning thereof, hath granted, bargained, sold, aliened, released, and confirmed, and by these presents, doth grant, bargain, sell, alien, release and confirm (describing the land), to have and to hold the hereby bargained and sold lands, with their appurtenances, to the said Beall and Gantt, and the survivor of them, and the heirs of such survivor, forever; to and for the special trusts following, and no other, that is to say: That all the said lands hereby bargained and sold, or such part thereof as may be thought necessary or proper to be laid out, together with other lands, within the said limits for a Federal city, with such streets, squares, parcels, and lots, as the President of the United States for the time being shall approve; and that the said trustees shall convey to the commissioners for the time being, appointed by virtue of the act of Congress entitled 'An Act for Establishing the Temporary and Permanent Seat of Government of the United States,' and their successors, for the use of the United States forever, all the said streets and such of the said squares, parcels, and lots as the

President shall deem proper, for the use of the United States; and that as to the residue of the said lots, into which the said lands hereby bargained and sold shall have been laid off and divided, that a fair and equal division of them shall be made. And all the said lots which may in any manner be divided or assigned to the grantor shall thereupon, together with any part of the said bargained and sold lands, if any, which shall not have been laid out in the said city, be conveyed by the said Beall and Gantt, or the survivor of them or the heirs of such survivor, to him, the said grantor, his heirs and assigns. And that the said other lots shall and may be sold at such time or times, in such manner, and on such terms and conditions, as the President of the United States for the time being shall direct. And that the said Beall and Gantt, or the survivor of them, or the heirs of such survivor, will, on the order and direction of the President, convey all the said lots so sold and ordered to be conveyed to the respective purchasers, in fee simple, according to the terms and conditions of such purchases." In the deed it was also provided "that the said grantor, his heirs or assigns, shall and may continue in possession and occupation of the said lands hereby bargained and sold, at his and their will and pleasure, until they shall be occupied under the said appropriations for the use of the United States as aforesaid, or by purchasers; and when any lots or parcels shall be occupied under purchase or appropriations as aforesaid, then, and not till then, shall the said grantor relinquish his occupation thereof." Burch's Digest, 330.

The general assembly of Maryland ratified the cession on December 19, 1791. This act recognized that, under the previous agreement, certain proprietors of lands lying in the District of Columbia had deeded their lands to trustees in order that the lands so conveyed might be laid out into streets, alleys, lots, and blocks, which should constitute "a Federal city." The act of ratification further provided a method by which all the proprietors within the limits of the proposed city should convey their lands in trust under the same conditions as were contained in the deeds already executed. The Maryland act of ratification further provided, in relation to the conveyance of

the lands within the limits of the proposed city to the trustees, Beall and Gantt, for the purpose of dividing the same into streets, alleys, lots, and blocks, as follows: "That nothing herein contained shall be so construed to vest in the United States any right of property in the soil as to affect the rights of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States." The act also provided that the laws of Maryland should remain in force until Congress should provide for the government of the District.

The grantors of the block in which the lot in question is located appear from the face of the certificate to have been George Walker and William Prout. The apportionment of this block is evidenced by what is called "a certificate of allotment," which appears of record, and is as follows:

Sept'r 29, 1796.

The Commissioners and George Walker and William Prout, original proprietors of this Square numbered Eight hundred and thirty-four in the City of Washington have agreed on the division thereof in manner following to wit Lots numbered three, four, five, six and seven are to remain to the said William Prout. Lots numbered thirteen, fourteen, fifteen, sixteen and seventeen are to remain to the said George Walker, and Lots numbered one, two, eight, nine, ten, eleven, twelve, eighteen, nineteen and twenty are subject to be sold agreeable to the Deeds of Trust concerning Lands in the said City.

Witness our hands this twenty-ninth day of September in the Year one thousand and seven hundred and ninety-six.

Gusts. Scott,
William Thornton,
Alexr. White,
Geo. Walker,
Wm. Prout,
Commiss'rs.

Witness:
Wm. Brent.
T. Munroe.

On the back of said certificate appears the following indorse-ment:

## Square No. 834.

Received to be recorded the 17th day of March 1797, and same day was recorded in Square Book No. 3 folio 834, one of the Square Records for that part of Columbia which lies within the State of Maryland.

Ex'd by                                    Jno. M. Gantt, Cl'k

This certificate, plaintiff insists, establishes a common source of title direct from the United States. The execution of it, he claims, was the exercise of sovereign power on the part of the United States. It will be observed that this is not a sealed instrument, asserts no interest or estate in the property therein described, alleges no consideration, and contains no clause of conveyance. It merely stipulates that the lot in question is to remain to the said William Prout. In an act of the Maryland assembly supplementing the ratification act it was provided: "That the certificates granted, or which may be granted, by the said commissioners, or any two of them, to purchasers of lots in the said city, with acknowledgment of the payment of the whole purchase money, if any shall have arisen thereon, and recorded agreeably to the directions of the act concerning the territory of Columbia, and city of Washington, shall be sufficient and effectual to visit the legal estate in the purchasers, their heirs and assigns, according to the import of such certificates, without any deed or formal conveyance." Burch's Digest, 224. It will be observed that this act refers to certificates granted to purchasers, and not to the grantors.

The crucial question for our consideration is, Did this certificate pass a legal title from the United States to Prout, and was its execution an act of sovereignty on the part of the United States? If not, plaintiff's case must fail. The rule in ejectment proceedings is well settled, "that the plaintiff in ejectment must in all cases prove a legal title to the premises in himself, at the time of the demise laid in the declaration,

and that evidence of an equitable estate will not be sufficient for a recovery, are principles so elementary and so familiar to the profession as to render unnecessary the citation of authority in support of them." *Fenn* v. *Holme,* 21 How. 481, 16 L. ed. 198; *Bagnell* v. *Broderick,* 13 Pet. 450, 10 L. ed. 242; Warvelle, on Ejectment, 245. The duty devolves upon the plaintiff of establishing, by convincing proof, the strength of his own title. No presumptions can be indulged in his favor. Any weakness or want of title in the defendant will not afford him any relief. The burden of proof rests upon the plaintiff throughout the case. No presumption whatever can be indulged in his favor as against the defendant who is conceded to be in possession of the property in controversy.

It is clear that, from the agreements herein referred to, the rights which the United States acquired, so far as the soil is concerned, are derived from the individuals who owned the land at the time of the cession, and were not granted by the State of Maryland. The foundation of the government's title to so much of the real estate as was ultimately dedicated to streets, alleys, or public grounds rested upon contract with the individual proprietors. As to this portion of the ceded territory, title in the soil became vested in fee simple in the United States. The powers, however, which can be lawfully exercised over the realty are derived from the same source, and no rights can be created which the proprietors from whom title came did not possess. The agreement and deeds from which these rights are derived can only be interpreted and construed as if they were contracts between private individuals. The government in these transactions exercised no act of sovereignty, but placed itself upon a level with the individual citizen. If the United States acquired any sovereignty over the soil of the District of Columbia, it could only have been derived from the Maryland act of cession. The act of 1791, sec. 2, passed by the general assembly of Maryland, places a distinct limitation upon the powers of Congress by declaring in unambiguous terms that the cession shall confer no other right in the land than may be conveyed by the original proprietors. It

is therefore clear that the United States acquired no such sovereignty over the soil within the District, acquired from the former proprietors, as it possesses in its public lands, or as the original States, Maryland among others, acquired from the English Crown. Neither could Maryland have conveyed to the United States such a sovereignty over the soil of the District, since title had passed from her to individual proprietors.

Even assuming that the title to the land in question passed to the government, it is impossible to derive a common source of title from the United States. That source must be found in a more remote period, and in a title direct from the original sovereign to the original proprietor. It seems to be well settled that when an officer or commissioner, as in this case, acting under authority of law and in accordance with its forms, conveys to an individual a tract of land owned by the government, the conveyance will pass only such title as the government has therein; and there is no greater presumption of law that the title is valid than if it had been derived from an individual proprietor. In *Sabariego* v. *Maverick,* 124 U. S. 261, 31 L. ed. 430, 8 Sup. Ct. Rep. 461, the court, considering the effect of a government title derived from an individual proprietor, said: "But in all these cases the question was whether the documents, with the recitals therein, and the presumptions of law and fact arising thereon, shown to have been executed by officers of the government, within the apparent scope of their authority, were sufficient in the first instance to show that the title of the government assumed by them to exist passed by the conveyance which undertook to transfer it. In no case, however, have they been held sufficient, where the fact in issue was whether the government at that time had any title to convey, to establish the fact in dispute, as against parties claiming a pre-existing adverse and paramount title in themselves. All that can be reasonably or lawfully claimed as the effect of such documents of title is that they pass such estate, and such estate only, as the government itself, in whose name and on whose behalf the official acts appear to have been done, had at the time, but not to conclude the fact that the estate conveyed

was lawfully vested in the grantor at the time of the grant. This is the doctrine declared by this court in the case of *Herron* v. *Dater,* 120 U. S. 464, 30 L. ed. 748, 7 Sup. Ct. Rep. 620. In that case, it was sought to give effect to a recital in a patent from the State of Pennsylvania as against the party who at the date of the patent was shown to have a title good as against the State. It was said by the court (p. 478) : 'Clearly that recital was not evidence against the plaintiffs, for if the patent could not take effect against them without it, it could not give any effect to that recital. Their right had already vested prior to the existence of the patent, and the grant to them could not be affected by a subsequent grant to a stranger.' So in the present case, the question is not whether the title which the King of Spain had to the lands in controversy passed by the documents in question to Garcia, but whether at that date the King of Spain had the title which they purport to convey." Assuming, therefore, that the government received from Prout, or Prout and Walker, a conveyance in fee simple of the land in question, and that the certificate of allotment operated as a conveyance of the fee from the government to Prout, it must still be conceded that the United States could convey no higher title than it received. It must be treated as an individual vendee and vendor. The transaction forms but a common link in the chain of title. The United States acquired no such sovereignty as would defeat the rights of a prior adverse claimant asserting a paramount title. This being true, it is apparent that it could assert no higher title to the land than that of an individual proprietor. It acquired only such title as had descended from the original sovereign.

At this point it is proper to consider whether the legal title to the land here in controversy ever passed to the United States. The streets, alleys, and lands selected by the President for public purposes, for which the grantors were to be paid at the rate of twenty-five pounds per acre, by the terms of the deeds of trust and the agreement became vested in the United States in fee simple, as soon as the same were selected, set apart, and apportioned by the commissioners. As to the lands so embraced,

the executory agreement, and the deed of trust made in pursuance thereof, were no longer executory, but became final and complete. Quoting from the opinion in *Van Ness* v. *Washington,* 4 Pet. 284, 7 L. ed. 859, where the court was considering the import of the conveyance of the streets and public squares in the city, Mr. Justice Story said: "Now, upon such legal import there do not seem grounds for any reasonable doubt. The streets and public squares are declared to be conveyed 'for the use of the United States forever.' These are the very words which by law are required to vest an absolute unconditional fee simple in the United States. They are the appropriate terms of art, if we may so say, to express an unlimited use in the government. If the government were to purchase a lot of land for any general purpose, they are the very words which the conveyance would adopt in order to grant an unlimited fee to the use of the government." The remaining lots that were to be apportioned and sold for the benefit of the United States the trustees were to deed to the purchasers in fee simple. As to this land, title never vested in the United States. Under the terms of the trust, the fee passed through the trustees from the grantors to the purchasers. The United States simply received the proceeds of the sales. But we think the terms of the agreement, and the deeds of trust under the ratification act, which approved the transaction, were different in regard to the lots which were to be apportioned and returned to the grantors. The trust reposed in the trustees contemplated that, when the trust should be executed, final and complete, the grantors should be completely devested of title in fee simple of all the lands conveyed, except so much as should be apportioned to the grantors. As to the lands that should be apportioned back to the grantors the statute provided: "And all persons to whom allotments and assignments of lands shall be made by the commissioners, or any two of them, on consent and agreement, or pursuant to this act without consent, shall hold the same in their former estate and interest, and in lieu of their former quantity, and subject in every respect to all such limitations, conditions, and encumbrances as their former estate and

interest, and in lieu of their former quantity, and subject, in every respect, to all such limitations, conditions, and encumbrances as their former estates and interests were subject to, and as if the same had been actually reconveyed pursuant to the said deed in trust." It will be observed that this provision in the ratification act not only negatives the contention that title to the land in question ever passed to the United States, but specifically provides that the apportionment by the commissioners shall have the same effect "as if the same (the lands apportioned to the grantors) had been actually reconveyed (by the trustees) pursuant to the said deed in trust." Hence, the certificate of apportionment issued to the grantors served a two-fold purpose; to define and describe of record the lands so apportioned, and as evidence of the termination of the trust as to the lands therein described. No form of conveyance was stipulated, and none was necessary. Possession of these lands had not passed from the grantors. The "certificate of allotment" was sufficient to accomplish the release of the trust. The "certificate of allotment" was sufficient to restore the equity in the grantor. It appears, therefore, that plaintiff can get no relief from this certificate, whether it be considered as a conveyance from the government, or a mere release of the trust. In any view of the case, he is required to go beyond it to seek a common source of title.

At the trial of this cause, plaintiff offered portions of the record of the proceedings in the circuit court of the District of Columbia for Washington county, in the matter of the estate of William Prout, deceased. It was sought by this to establish that the final decree entered therein vested title to the lot in question in William Prout, one of the heirs of William Prout, deceased. This record is assailed "on the ground that the court had no jurisdiction to pass any such decree; that there was no showing that William Prout owned the land in controversy; that he was dead; that he died intestate; that any proceeding was brought by any proper person; that any or all of the heirs were before the court; that any persons were appointed as commissioners; or that the decree was part of a chain of title

from the sovereignty to the plaintiff." Over this objection all the portions of the records that are in existence in the matter of the estate of William Prout were admitted. It appears that a number of the original papers have been lost, among them, the petition for the appointment of an administrator, which would doubtless have enumerated the legal heirs of William Prout. The record is deficient in that it does not show many of the preliminary proceedings connected with the administration of the estate. In the record appears the following report of the commissioners appointed to partition the real estate of William Prout, deceased:

In the Matter of the Estate of William Prout.

To the Honorable the Judges of the Circuit Court of the District of Columbia for the County of Washington:

We the subscribers commissioners named in the commission hereto annexed, in virtue of the powers vested in us by the said commission do certify and return to your Honors, that in execution of the said commission, on the twentieth day of September one thousand eight hundred and thirty and having given reasonable notice to all the parties concerned of the matter of our proceeding in the execution of the said commission before any other proceeding was had as will appear by the notice herewith returned and which we pray may be taken as part of this our return, we in conformity with said notice met on the 12th day of September 1830 at the time and place in said notice mentioned and having made an accurate view and observation of the pieces or parcels of ground and premises in said commission mentioned, and then and there took into consideration every circumstance relative to the said pieces or parcels of ground and premises in the said commission mentioned were of opinion and did adjudge and determine that all the said pieces or parcels of ground and premises could be divided without loss or injury to all or any of the parties entitled. And we did therefore divide and make partition of the same fairly and

equally in value between all the parties interested according to their several proportions as follows, viz.:

To Johnathan Prout (a large number of lots described).

To Robert Prout (a large number of lots described).

To William Prout as follows:

834 Lots three four five six & seven.

(And a large number of other squares and lots).

To Martha Hale McKnight (a large number of lots described).

To Mary Prout ( a large number of lots described).

In testimony whereof we have set our hands and seals this fifth day of November one thousand eight hundred and thirty.

|  |  |
|---|---|
| Edw'd Simms | (Seal.) |
| Geo. Adams | (Seal.) |
| James Friend | (Seal.) |
| John Nowland | (Seal) |

The order of the court ratifying and confirming the report of the commissioners also appears as follows:

### In the Circuit Court of the District of Columbia for Washington County.

It appearing to the satisfaction of this court that the former order of this court made in this cause on the 23 day of March 1831 for the ratification and confirmation nisi of the report of the commissioners appointed to make a division of the estate of William Prout, deceased, amongst his heirs at law has been duly published in conformity with the said order and no cause having been shown against the ratification or confirmation of the said report or the partition or allotment made by the said commissioners it is therefore this 17 day of June 1831 by this court ordered that the said report partition and allotment be and the same are hereby finally ratified and confirmed.

By order of the Court,                    W. Brent, Cl'k.

The record of the division of the real property belonging to the estate of William Prout, deceased, in which the lot in

question was apportioned to the junior William Prout, appears in "Chancery Partitions, Book J. A. S., No. 1," in the office of the clerk of the supreme court of the District of Columbia. It will be observed that the report of the commissioners recites the issue of a commission to them from the circuit court of the District of Columbia, and the order confirming the report of the commissioners recites that the commissioners were "appointed to make a division of the estate of William Prout, deceased, amongst his heirs at law."

The sufficiency of these proceedings to convey title to William Prout is denied by defendant. We may inquire, first, whether it sufficiently appears upon the face of the record that the court had jurisdiction to enter the order appearing in the record. Counsel for appellant concedes "a presumption that the court had jurisdiction of the subject-matter of partitions generally and of these persons mentioned in the proceedings as parties," but insists that "there is no presumption as to who were the heirs of William Prout, deceased, nor that all or any of them, except these two (Jonathan and Mary Prout), were before the court." With the general jurisdiction of the court conceded, the inquiry is narrowed to the sufficiency of this record to disclose a proper exercise of that jurisdiction. The order of the court ratifying and confirming the report of the commissioners certifies that "the commissioners were appointed to make division of the estate of William Prout, deceased, amongst his heirs at law." The commissioners, proceeding under that order, made a division of the property between Jonathan Prout, Robert Prout, William Prout, Martha Hale McKnight, and Mary Prout. These are the persons referred to in the decree as the heirs at law of William Prout. It is not necessary to go beyond the record before us to find that these are the legal heirs. No presumption on this subject arises. The court, in ratifying the report of the commissioners partitioning the estate, rendered a final decree in the proceedings, which had the effect, under the statute then in force, of vesting title to the property in the persons to whom it was respectively apportioned. The appointment of commissioners to partition the

estate, and the ratification of their report by the court after due publication, is conclusive as to all persons. Such record is absolute verity. It cannot be contradicted upon an averment of lack of evidence, for the sufficiency of the evidence to support the action of the court will be presumed. It cannot be attacked for lack of parties, for it will be inferred that the court had all the proper parties before it, or took such legal precautions in the giving of proper notice that if there were proper parties who failed to appear, they are legally estopped from making complaint after the lapse of three-quarters of a century. In other words, the court having had the matter of the estate of William Prout within its jurisdiction to settle, as shown by the vital portions of the record before us, it will be presumed to have done its full duty. This was a proceeding *in rem,* and a final decree therein by a court of competent jurisdiction over the subject-matter could be impeached only by fraud in the party who obtained it, and not in a collateral proceeding. In *Thompson* v. *Tolmie,* 2 Pet. 157, 167, 7 L. ed. 381, 385, the court, discussing a decree of orphan's court on which a sale was ordered, said: "When there is a fair sale, say the court, and the decree executed by a conveyance from the administrator, the purchaser will not be bound to look beyond the decree, if the facts necessary to give the court jurisdiction appear on the face of the proceedings. After a lapse of years, presumption must be made in favor of what does not appear. If the purchaser was responsible for the mistakes of the court, in point of fact, after they had adjudicated upon the facts, and acted upon them, these sales would be snares for honest men. The purchaser is not bound to look farther back than the order of the court. He is not to see whether the court was mistaken in the facts of debts and children. That decree of an orphans' court, in a case within its jurisdiction, is reversible only on appeal, and not collaterally in another suit." A final decree in partition would have the same conclusive effect upon title vested under it, as it would upon title acquired under it by purchase.

We are of the opinion that there is sufficient disclosed in this record to support the presumption that the court not only

had the proper parties before it, but that the legal heirs at law of William Prout were the persons to whom the estate was apportioned in the report of the commissioners in partition.

It is unnecessary to consider the other errors assigned, as the judgment of the court below must be reversed. The judgment is reversed, with costs, and the cause remanded for furthr proceedings in accordance with the views herein expressed.

*Reversed.*