WASHINGTON MEDICAL CENTER,
INC., et al.

v.

The UNITED STATES.

1776 K STREET ASSOCIATES

v.

The UNITED STATES.

METROPOLITAN CLUB OF the CITY
OF WASHINGTON

v.

The UNITED STATES.

D. F. ANTONELLI, Jr.

v.

The UNITED STATES.

Jack KOGOK

v.

The UNITED STATES.

Nos. 359–72, 333–73, 156–75, 246–75
and 247–75.

United States Court of Claims.

Oct. 20, 1976.

Lawrence A. Miller, Washington, D. C., attorney of record for plaintiff 1776 K Street Associates.

Whayne S. Quin, Washington, D. C., attorney of record for plaintiffs Washington Med. Center, Inc., Metropolitan Club of City of Washington and Jack Kogok; Wilkes & Artis, Washington, D. C., and Glenn D. Simpson, Rockville, Md., of counsel.

Thomas L. McKevitt, Washington, D. C., with whom was Asst. Atty. Gen. Peter R. Taft, Washington, D. C., for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and SKELTON, Judge.

ON DEFENDANT'S MOTION AND CROSS-MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFFS' JOINT MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

In these five consolidated cases four of the plaintiffs sue the United States to recover money paid by them to the United States for the closing of certain portions of various original alleys in the city of Washington, D. C., and the remaining plaintiff sues the Government to recover the amount paid by him to the United States for the closing of a portion of an original street in said city, namely, G Street, N.W.[1] The defendant contends that the charges made for the closing of the portions of the alleys and G Street were proper and in accordance with laws enacted by the Congress, and that the plaintiffs should be denied any recovery. The case is before us on cross-motions for summary judgment.

After carefully considering the pleadings, evidence, briefs, and the argument of counsel, we conclude that the plaintiffs are not entitled to recover and we hold for the defendant.

The facts involved in these cases are generally as follows. The plaintiff, Washington Medical Center, Inc., joined by William J. Cusack and Frances S. Cusack and Mary C. Morgan, 1776 K Street Associates, the Metropolitan Club of the City of Washington, and D. F. Antonelli, Jr., were the owners of various lots abutting certain portions of original alleys in the original squares listed below.[2] None of these plaintiffs owned all of the lots in an entire

1. "Original alleys" and "original streets" are those alleys and streets that were laid out and provided for in the original Federal City of Washington in the District of Columbia.

2. When the city of Washington, D. C., was laid out and platted, the equivalent of modern day city "blocks" were called "squares." They are still referred to in that manner in the decided cases and laws and will be referred to as such in this opinion.

square. The plaintiff Jack Kogok owned certain lots abutting on a portion of G Street, N.W. All of the plaintiffs desired to have the portions of the alleys and street (in the case of Kogok) closed so that they could erect buildings or other improvements thereon. Accordingly, they filed applications with the City Council (formerly the City Commission) of Washington, D. C., the duly authorized agent of the United States, to close the portions of the alleys and street on which their lots abutted. The council acted favorably on the applications of the plaintiffs provided that the plaintiffs would pay "a price not less than the assessed value of contiguous lots." The plaintiffs agreed to such payments and the council determined and found that the proper payments to be made by the plaintiffs, respectively, for the closing of the portions of the alleys in the squares and street listed below were as follows:

| Plaintiff | Squares | Fair market value |
|---|---|---|
| (a) Washington Medical Center | 107 | $247,701.60 |
| (b) 1776 K Street Associates | 126 | 74,769.05 |
| (c) Metropolitan Club | 166 | 63,725.40 |
| (d) D. F. Antonelli, Jr. | 252 | 30,766.00 |
| (e) Jack Kogok | G Street, N. W. | 34,700.00 |

The plaintiffs represented to the council that they were willing to pay the above amounts, respectively, if the council would close said portions of the street and alleys, and, in reliance on such representations, the council made such closings. The plaintiffs voluntarily, and without protest, paid the above amounts found by the council to be due by them, respectively, and in fact were eager to do so. Title to the closed portions of the street and alleys was vested by the council in the respective plaintiffs upon their closings and thereafter the plaintiffs erected buildings or other improvements thereon. At all times the plaintiffs and the council conducted these transactions on the theory that the United States had fee simple title to these original alleys and to original G Street, N.W. The money paid by the plaintiffs was deposited in the United States Treasury to the credit of the United States.

Within three years after the street and alleys had been closed, all of the plaintiffs filed suits in the District Court of the District of Columbia for a refund of the payments they had made for such closings. The suits were against the District of Columbia and the United States. In those suits the plaintiffs relied on the decision of the district court in the case of *Carr v. District of Columbia,* 312 F.Supp. 283 (D.D.C.1970) which held that the District of Columbia could not charge abutting property owners for the closing of a non-original alley under the Street Readjustment Act of 1932, D.C.Code § 7-401, and that it could not charge them for the depreciated value to nearby property caused by the closings. The D.C. Court of Appeals affirmed without an opinion.

In their district court suits for refunds, the plaintiffs included claims for portions of the closed alleys that were not a part of the original alleys involved here, but were common law dedicated portions of the closed alleys owned by the District of Columbia for which the council charged them. They also asked for refunds for the amounts (not involved here) for the alleged depreciated value of nearby property caused by the closings. Included in those suits were also the identical claims involved here for refunds of the amounts paid to the United States for the closing of the described portions of the *original* alleys and original G Street, N.W. On January 8, 1974, the district court entered orders in those cases (Civil Actions Nos. 1906-72, 2514-72, 1905-72, 660-72, 1093-71 and 2015-70) holding that the District of Columbia could not charge abutting property owners the fair market value of alleys *owned* and closed by the District of Columbia unless an objection to the closing has been made, nor charge for the depreciated value of nearby property caused by the closing, "notwithstanding the fact that a portion of the land in Square * * * was original U.S. property." The court entered judgment for the plaintiffs on such claims, but dismissed the United

States from the suits because of lack of jurisdiction. In the course of the appeal the plaintiffs raised for the first time the proposition that the United States did not have title to the original alleys and the original street that were closed and by reason of that fact could not charge the plaintiffs for the closings. On June 20, 1975, the D.C. Circuit Court of Appeals affirmed in cause No. 73–2053, 169 U.S.App.D.C. 301, 515 F.2d 1018 the judgment of the district court without opinion and without passing on the title question. Thereafter, the plaintiffs filed the present suits.

Plaintiffs in this action challenge the authority of the District of Columbia to impose a fair market value charge on the basis that (1) the United States had no title to the original street and original alleys that were closed, (2) the District of Columbia has no statutory authority to make such charges under either § 7–401, *et seq.* or § 7–303, (3) the land areas closed had only nominal value, and (4) the charges were in violation of the District of Columbia Administrative Procedure Act and due process of law.

The defendant says that (1) the plaintiffs are estopped by their prior actions from claiming the refunds, and (2) in any event the United States had fee simple title to the original street and the original alleys, and the District of Columbia was fully authorized by Acts of Congress to make the charges for closing the street and alleys involved here.

There is much support for defendant's estoppel argument and it may be that these cases could be disposed of on that basis. The closing of the street and alleys was a discretionary act on the part of the council. The plaintiffs had no constitutional right to have the street and alleys closed. Under these circumstances, the plaintiffs themselves affirmatively initiated the closing procedures by filing their closing applications with the council. They represented to the council that they were willing to pay the charges fixed by the council if the street and alleys were closed, and they intended for the council to rely on these representations. The council did rely on them

and closed the street and alleys to the detriment of the city and the United States in that the closed portions of the street and alleys could no longer be used for travel or traffic, garbage pickup, access by police, ventilation, passage of fire trucks, and the installation of utility lines such as gas, telephone, water, sewer, and electric light and power. The plaintiffs voluntarily and willingly paid the charges for the closings without any protest whatever as to title or as to the procedure followed by the council in closing the street and alleys. The title to the closed portions of the street and alleys was vested in the plaintiffs by the council and the property was delivered to them. Thereafter the plaintiffs erected buildings and other improvements on the property and have enjoyed the possession and use of the property since the dates of the closings and they or their successors in title will continue to use and enjoy the same for all time to come. From these facts, it appears that most if not all of the elements of estoppel against the plaintiffs and their claims are present in this case. The plaintiffs say that estoppel cannot be used against them, citing the case of *1776 K Street Associates v. District of Columbia,* No. 73–2053, 169 U.S.App.D.C. 301, 515 F.2d 1018 by the D.C. Circuit Court of Appeals. In that case the D.C. District Court held that estoppel would not apply against the plaintiffs who were suing for a refund of money paid by them to the District of Columbia for the closing of a *non-original* alley *owned by the District of Columbia,* because the District of Columbia Council had no authority to make such charges for the closing of an alley of this type owned by the District of Columbia, citing *Carr v. District of Columbia,* 312 F.Supp. 283 (D.D.C. 1970), aff'd mem., No. 24,406 (D.C.Cir. Sept. 28, 1971) another *non-original* alley closing case. The holding on estoppel in the above *1776 K Street Associates* case is clearly inapposite in the present case because the decision there was based on the lack of authority of the District of Columbia Council to charge for the closing of a non-original alley owned by the District of Columbia, whereas, in the instant case we are dealing

with an *original* street and *original* alleys which the defendant contends are owned in fee simple by the United States and which Congress has authorized to be closed and charges collected therefor by the District of Columbia Council as its agent. There is no lack of authority of the council to make the charges in this case.

Although, as pointed out above, it may be that we could dispose of these cases against the plaintiffs on the doctrine of estoppel, we have decided not to do so. We have concluded that the crucial and controlling question is the title issue, and that it should be decided not only for the purpose of disposing of the present cases, but also as a precedent for the solution of other like claims we understand are pending, and others that will no doubt arise in the future. A decision of the title issue is vital, because if the United States owned the street and alleys in fee simple at the time of the closings, Congress had the power to authorize the District of Columbia Council to charge for their sale (closings, and vesting of title in plaintiffs), because they were Government property. On the other hand, if the United States did not have title in fee simple to the street and alleys at the time they were closed, Congress would not have the power to authorize the council to charge for their closing, as the Government cannot sell property it does not own. In the latter case, the charges would be unauthorized and the plaintiffs would be entitled to refunds of the money paid if the plaintiffs themselves had title to the property.

In order to decide the title question, it is necessary to go back in history to the time of the founding of the Federal City of Washington.

The interesting history of the founding of the city of Washington, is set out in much detail in *Morris v. United States,* 174 U.S. 196, 245–259, 19 S.Ct. 649, 43 L.Ed. 946 (1898) (maps at 220–221, 19 S.Ct. 649), in somewhat more abbreviated from in *Van Ness v. City of Washington,* 29 U.S. (4 Pet.)

232, 7 L.Ed. 842 (1830), and, in shorter form in *Fitzhugh v. United States,* 59 App.D.C. 285, 40 F.2d 797, 798–799 (D.C.Cir.1930). The high points of that history are as follows:

Under the Charter of June 20, 1632, from Charles I, King of England, Cecilius Calvert, the first Lord Proprietary of the Province of Maryland, was granted all lands now embraced within the District of Columbia. After the American Revolution, Maryland became a state and succeeded to all rights of the Lord Proprietary, including the absolute right to the soil for use by the people of the new sovereignty.

The State of Maryland authorized cessation to the United States of the territory which is now the District of Columbia. (Act of December 23, 1788, Maryland Laws 1788, Chapter 46, D.C. Code, p. XXX (1973)). By Act of Congress, adopted July 16, 1790 (1 Stat. 130, Ch. 28; D.C. Code, p. XXXIII), as amended by Act of Congress approved March 3, 1791 (1 Stat. 214, Ch. 17; D.C. Code, p. XXXIV), the cession was accepted and the President of the United States was authorized to appoint three commissioners whose duty was to "survey, and by proper metes and bounds define and limit" such district or territory.[3] The Act empowered the commissioners "to purchase or accept such quantity of land on the eastern side of * * * [the Potomac River] for the use of the United States, and according to such plans as the President shall approve." Additionally the commissioners were required to provide suitable buildings for the accommodation of public offices prior to the first Monday in December 1800, at which time the seat of government would be transferred to the Federal City.

On January 24 and March 30, 1791, the President by proclamation located and defined the limits of the District of Columbia and appointed the commissioners who, with their successors, located and laid out the city of Washington. (D.C. Code, p. XXXIV and XXXV (1973)). The general

---

**3.** On January 22, 1791, President Washington appointed Thomas Johnson, Daniel Carroll and David Stuart as such commissioners. *See Morris v. United States, supra,* 174 U.S. at 250, 19 S.Ct. 649.

boundaries of the proposed city now called the "original" city were the Eastern Branch, the Potomac River, Rock Creek to a point near P Street, N.W., then following what is now Florida Avenue to 15th and H Streets, N.E., then south to C Street, N.E., then east to 20th Street and then south to the Eastern Branch. The land within was devoted mostly to farm purposes owned principally by 19 owners hereinafter sometimes referred to as "original proprietors."

While various maps and plans for the city were being prepared under the direction of the President and the commissioners, negotiations were being entered into between the commissioners and the original proprietors which resulted in agreements executed by the parties providing for the disposition of the land within the original city pursuant to deeds of trust to be executed. The agreements, signed March 13, 1791, provided as follows:

"We, the subscribers, in consideration of the great benefits we expect to derive from having the Federal City laid off upon our lands, do hereby agree and bind ourselves, our heirs, executors and administrators, to convey in trust to the President of the United States, or Commissioners, or such person or persons as he shall appoint, *by good and sufficient deeds in fee simple, the whole of our respective lands* which he may think proper to include within the lines of the Federal City, for the purposes and on the conditions following:

"*The President shall have the sole power of directing the Federal City to be laid off in what manner he pleases. He may retain any number of squares he may* think proper for public improvements, *or other public uses,* and *the lots only* which shall be laid off *shall be a joint property between the trustees on behalf of the public and each present proprietor,* and the same shall be fairly and equally divided between the public and the individuals, as soon as may be after the city shall be laid out.

"*For the streets the proprietors shall receive no compensation, but for the squares or lands in any form which shall be taken for* public buildings or any kind of public improvements *or uses,* the proprietors, whose lands shall be so taken, shall receive at the rate of twenty-five pounds per acre, to be paid by the public," etc. [Emphasis supplied.] [*Morris v. United States, supra,* 174 U.S. at 247–48, 19 S.Ct. at 670, and *Van Ness v. City of Washington, supra,* 29 U.S. at 276.]

On June 29, 1791, the proprietors executed deeds, all of which were identical, to Thomas Beall and John M. Gantt, trustees, who had been designated by the President, to consummate the agreement of the preceding March with the commissioners. All of the deeds conveyed all of the lands of the proprietors within the bounds of the city in fee simple upon the following trusts:

* * * "*That all the said lands, &c.,* as may be thought necessary or proper to be laid out, together with other lands within the said limits, for a federal city, *with such streets,* squares, *parcels* and lots as the president of the United States, for the time being, shall approve; and that the said (the trustees), &c., shall convey to the commissioners for the time being, appointed by virtue of the act of congress, entitled, &c., and their successors, *for the use of the United States for ever, all the said streets, and such of the said squares,* parcels and lots, *as the president shall deem proper, for the use of the United States;* and that as to the residue of the said lots into which the lands, &c., shall be divided, a fair and equal division of them shall be made, and if no other mode of division shall be agreed on, by consent of the said (grantor), &c., and *all the said lots* which may in any manner be divided or assigned to the said (grantor) shall thereupon, &c., be conveyed by the said (trustees) to the said (grantor), his heirs and assigns; and that the *said other lots* shall and may be sold at such time, &c., as the president of the United States for the time being shall direct; and that the *said (trustees), &c.,* will, on the order and direction of the president, *convey all the lots so sold,* and ordered to be conveyed, to the respective purchasers *in fee-*

simple, &c." * * * [Emphasis supplied.] [*Van Ness v. City of Washington, supra,* at 283.]

The Supreme Court in the *Van Ness* case then pointed out:

* * * Provision is then made that the twenty-five pounds per acre, *to be paid by the United States for the squares, should be paid out of the proceeds of such sales, and the residue shall be paid to the president, as a grant of money to be applied for the purposes, and according to the act of congress. Provision is also made for other objects, not material to be mentioned, and for a conveyance of the trust property to such other persons as the president might thereafter direct, *in fee,* "subject to the trusts then remaining to be executed, and to the end that the same may be perfected." In pursuance of this last provision, Beall and Gantt, the trustees, made a conveyance of the premises, by an indenture, dated the 30th of November 1796, to certain commissioners appointed under the act of congress, subject to the trusts then remaining to be executed; and, among other things, conveyed to the commissioners all that part of the lands, &c., which had been laid off into squares, parcels or lots for buildings, and now remaining so laid off, in the city of Washington. [Emphasis supplied.] [*Van Ness v. City of Washington, supra,* at 283–84.]

In the *Van Ness* case, only the streets and public squares in Washington, D. C. were involved. The heirs of one of the original proprietors contended in the suit that under the above trust agreement the streets and public reservations had to remain such and if changed or sold by the Government, the title thereto would revert to the heirs of the original proprietors who were the plaintiffs in that case. The Supreme Court held that the United States acquired a fee simple title to the streets and public squares under the above deeds of trust from the original proprietors. The Court said:

Now, upon such legal import, there do not seem grounds for any reasonable doubt. The streets and public squares are declared to be conveyed "for the use of the United States for ever." *These are the very words, which by law are required to vest an absolute unconditional fee-simple in the United States.* They are the appropriate terms of art, if we may so say, to express an unlimited use in the government. If the government were to purchase a lot of land, for any general purpose, they are the very words which the conveyance would adopt, in order to grant an unlimited fee to the use of the government. There are no other words or references in the instrument, which control in any manner the natural meaning of them. There are no objects avowed on the face of it, which imply any limitation. How then can the court defeat the legal meaning and resort to a conjectural intent?

* * * But it is sufficient for us, that here there is a solemn conveyance, *which purports to grant an unlimited fee in the streets and squares, to the use of the United States;* * * *

* * * *If the United States possess, as we think they do, an unqualified fee in the streets and squares,* that defeats the title of the plaintiffs, and definitively disposes of the merits of the cause. [Emphasis supplied.] [*Van Ness v. City of Washington, supra* at 285–86.]

Of course, the title to the original alleys was not involved in that case, but we think the same reasoning should be applied to such alleys because they were included in the squares. The trust agreement conveyed *all* the lands of the proprietors in the city to the United States in *fee simple.* It is to be noted that the deeds conveyed such lands "for the use of the United States forever all the said streets, and *such of the said squares,* parcels and lots, *as the president shall deem proper, for the use of the United States.*" [Emphasis supplied.] As shall be shown below, President Washington, by a proclamation and regulations, reserved the property in the alleys for the use of the public (United States).

As for the original streets, the Supreme Court held in yet another case, namely, *Potomac Steamboat Co. v. Upper Potomac Steamboat Co.,* 109 U.S. 672, 3 S.Ct. 445, 27 L.Ed. 1070 (1884), that the United States held fee simple title to all of the streets in the original city of Washington. The Court quoted with approval the above holding in the *Van Ness* case and stated:

It was accordingly decided in that case that *the ownership of the land over which the streets* in the city of Washington *had been laid out on the original plan was vested by the deeds of the proprietors in the United States* so completely and unconditionally that Congress might lawfully dispose of it to private persons, or otherwise convert it to any use whatever. [Emphasis supplied.] [*Id.* at 681, 3 S.Ct. at 450.]

The Court stated further:

Notley Young [one of the proprietors] and the successor to his title had no property in the street, not even the right to insist that it should be maintained as such. *The United States held its title to the land over which it was laid out,* for its own use, and not in trust for any person or for any purpose. [Emphasis supplied.] [*Id.* at 684, 3 S.Ct. at 452.]

■ From these decisions and the agreement with the proprietors and their conveyances to the trustees, we hold that the fee simple title to the *original streets* was and is vested in the United States.[4]

As to the *original alleys,* we wish to emphasize that in the agreement with the proprietors it was provided:

*The president shall have the sole power* of directing the federal city to be laid off in what manner he pleases. *He may retain* any number of squares * * * for public improvements or *other public uses;* and the *lots only* * * * shall be the joint property between * * * the

public and each * * * proprietor and the same shall be * * * equally divided * * * for the *squares or lands,* in any form, which shall be taken for * * *any kind of public improvements or uses,* the proprietors * * * shall receive * * * twenty-five pounds per acre to be paid by the public. [Emphasis supplied.]

The conveyances from the proprietors contained the following pertinent provisions:

*The president shall have the sole power* of directing the federal city to be laid off in what manner he pleases. *He may retain any number of squares * * * for public improvements or other public uses,* and the *lots only* * * * shall be a joint property between * * * the public and each * * * proprietor and the same shall be * * * equally divided * * *.

* * * [F]or the squares *or lands in any form* which shall be taken for * * *any kind of public improvements or uses,* the proprietors * * * shall receive * * * twenty-five pounds per acre to be paid by the public. [Emphasis supplied.]

■ We interpret these instruments as giving President Washington full power and authority to vest a fee simple title in the original alleys in the United States. He did so by issuing in his own handwriting the following regulations on October 17, 1791:

*The way into the square,* being designed in a special manner, for the common use and convenience of the occupiers of the respective squares, *the property in the same is reserved to the public,* so that there may be an immediate interference on any abuse of the use thereof by any individual to the nuisance or obstruction of others. The proprietors of the lots

---

4. On December 19, 1791, the State of Maryland ratified the previous Act of Cession (Maryland Law 1791, Ch. 45; D.C. Code, p. XXX) noting that agreements had been entered into between the commissioners and the original proprietors by the Deeds of Trust previously described and included in the ratification a specific proviso stating "That nothing herein contained shall be so construed to vest in the United States any right of property in the soil as to affect the rights of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States * * *."

adjoining the entrance into the squares, on arching over the entrance and fixing gates in the manner the Commissioners shall approve shall be entitled to divide the space over the arching and build it up with the range of that line of the square.

\* \* \* \* \* \*

These regulations are the terms and conditions under and upon which conveyances are to be made according to the deeds in Trust of the lands within the City.

Signed G. Washington [5]

The controlling words in these regulations as far as the title to the alleys is concerned are:

The way into the square \* \* \* the property in the same is reserved to the public \* \* \* [6]

The word "property" is defined in Webster's Seventh New Collegiate Dictionary, 1965 as follows:

Ownership, something to which a person has legal title.

It is defined in The Living Webster Encyclopedic Dictionary of the English Language, 1971 as follows:

That which one owns \* \* \* goods or lands owned \* \* \* ownership or right of possession, enjoyment, or disposal of anything, especially of something tangible \* \* \*.

"Property" is defined in Black's Law Dictionary 1382 (4th ed. (Rev.) 1968) as follows:

\* \* \* [T]hat which belongs exclusively to one: \* \* \*. The term is said to extend to every species of valuable right and interest. \* \* \* More specifically, ownership; the unrestricted and exclusive right to a thing; the right to dispose of a thing in every legal way, to possess it, to use it, and to exclude every one else from interfering with it. The exclusive right of possessing, enjoying, and dispos-

ing of a thing. \* \* \* The highest right a man can have to anything; \* \*.

See also 73 C.J.S. Property § 1 (1951), where "property" is defined as follows:

The word "property" means ownership, and it also means the right of ownership. In one sense, "property" signifies the sum of all the rights and powers which are incident to ownership, and it means every right which accompanies ownership and is its incident, since all rights which pertain to the ownership of property are property. In the narrower sense "property" implies exclusive ownership of things, as where a man owns a piece of land or a horse, and thus the thing of which there may be ownership is called "property," as is whatever is exclusively one's own. The term is further defined as meaning that to which a person has a legal title, whether or not in his possession; but property in a thing does not consist merely in its ownership and possession. "Property" is sometimes defined as meaning estate, whether in lands, goods, money or intangible rights; and in the Blackstonian sense "property" means those things which one has the right to hold, possess, and enjoy to the exclusion of any other individual in the universe. [Footnotes omitted.] [*Id.* at 148.]

*See also* Words and Phrases, Vol. 34–A, *Property,* at 110, 114–15, 118; *Nashville, Chattanooga & St. Louis Ry. Co. v. Wallace,* 288 U.S. 249, 53 S.Ct. 345, 77 L.Ed. 730 (1933); and *Texas Co. v. Hauptman,* 91 F.2d 449, 451 (9th Cir. 1937).

█ The word "reserved" has the ordinary meaning of "retained," "kept" or "set apart." The word "public" means the "United States," which is the same meaning given to it in the agreements with the proprietors and as used in their conveyances to the trustees.

Therefore, we conclude that this reservation by President Washington had the same

---

**5.** On file in the National Archives in Washington, D. C.

**6.** An original alley in the city of Washington, D. C. was called a "way into the square." In later years Congress referred to it as an alley and we will use the term "alley" in this opinion.

meaning and the same effect as if it had been worded as follows:

The alley * * * the fee simple title in the same is retained in the United States * * *.

■ We hold that this reservation, together with the agreements with the proprietors and their conveyances of all their lands in fee simple to the trustees, vested fee simple title to the original alleys in the United States. This holding is supported by the fact that the United States has asserted sovereignty over these alleys, after the cession by Maryland of the land involved, for over 175 years. During this period of time the common reputation of the alleys was that they were owned by the United States. (See 73 C.J.S. *Property* § 17 (1951), *Id.* at 213, ¶ *Common reputation.*) For almost two centuries everyone had recognized and understood that the United States had title in fee simple to the original alleys. The plaintiffs were of that opinion at the time the alleys in the instant case were closed. No one has ever raised the question until the plaintiffs injected it into these cases in what appears to be an afterthought to recover money they willingly paid for property they obtained and are now enjoying. The Congress has always believed that the United States owned the original alleys, as shown by the various laws it has passed relative to their closing and sale.

■ The plaintiffs claim that the purchasers of the original lots also paid for portions of the alleys and that the title to such portions passed to the purchasers and that plaintiffs succeeded to their title. The only proof by plaintiffs of such payments are copies of plats of the original squares involved with the apportionments made by the commissioners between the United States and the proprietors. In none of the apportionments are the alleys mentioned. At the bottom of the plats are certain unintelligible and illegible figures relating to alleys that plaintiffs say are on file in the Registers of Squares and these are submitted as proof of their claims. These figures have not been proved up in a proper way and have no probative value whatever. The Supreme Court in the *Morris* case disposed of the same kind of evidence as follows:

An effort is made to distinguish the case of these lots from that of the lots east of Seventeenth street by referring to a book marked "Register of Squares," produced from among the records of the city, and wherein squares 63 and 89 are bounded on the north by Water street and on the south by the Potomac River, and square 129 is bounded on the north by B street and on the south by the Potomac River.

It was the opinion of the court below that there was a lack of evidence to prove that the registers of squares were contemporaneous and original books which it was the duty of the Commissioners to keep, that the entries were not in their handwriting, nor in that of any person whose handwriting is proved, and that they have not the quality of a public record.

We agree with that court in thinking that, in no point of view, on the evidence adduced in this case, can effect be given to these registers of squares as contradicting or overriding the plans of the city adopted by the President, wherein, as we have seen, the squares in question were bounded by streets interposed between them and the channels of the river. [*Morris v. United States,* 174 U.S. at 276–77, 19 S.Ct. at 681.]

We agree with the decision of the Court in that case on this point and reject this evidence for the same reason.

■ The plaintiffs argue that the purchasers of the original lots acquired title to portions of the alleys and that they are their successors in title. Neither proposition has been proved. There is no evidence that the original purchasers of the lots received a conveyance of any portion of the alleys, nor is there any proof showing a chain of title to the alleys from such purchasers to the plaintiffs. Plaintiffs' contentions amount to no more than general allegations without proof. The plaintiffs have

occupied themselves with attacking the title of the United States in the alleys without proving that the plaintiffs themselves have title. In suits to quiet title and in trespass to try title, there is a well-established rule that a plaintiff can recover only on the strength of his own title and not on the weakness of defendant's title. *See* 87 C.J.S. *Trespass To Try Title* § 17 (1954) at 1131; *Shapleigh v. Mier,* 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355 (1937); *Bursey v. Lyon,* 30 App.D.C. 597 (1908); and *Kirby Lumber Corp. v. Cain,* 255 F.2d 72 (5th Cir. 1958). Many other cases could be cited. *See also,* 74 C.J.S. *Quieting Title* §§ 17, 76 (1951) at 41–42 and 119 and cases cited in footnote 58 at 41. While the present suits do not fall in either of those categories, the above principle should apply here, because the plaintiffs could not recover in any event unless they have fee simple title to the street and alleys. This they have not proved.

The plaintiffs also contend that when the lots abutting on the street and alleys were sold, the street and alleys passed to the purchasers as appurtenances to the abutting lots. It is well settled that land cannot be appurtenant to land. This principle was well stated by the Supreme Court in *Harris v. Elliott,* 35 U.S. (10 Pet.) 25, 9 L.Ed. 333 (1836). In that case the United States bought several lots for a navy yard. The lots were bounded by certain streets. One of the lots was described by metes and bounds (not including the streets), *"with appurtenances."* The United States fenced in the streets as a part of the navy yard, claiming that they passed to the United States as appurtenances to the abutting lots. The Court held against the Government saying:

> * * * This term, [appurtenance] both in common parlance and in legal acceptation, is used to signify something appertaining to another thing as principal, and which passes as an incident to the principal thing. Lord Coke says (Co. Litt. 121*b* ), a thing corporeal cannot properly be appurtenant to a thing corporeal, nor a thing incorporeal to a thing incorporeal. According to this rule, *land cannot be*

*appurtenant to land.* In the case of *Jackson v. Hathaway* (15 Johns [447], 454), the court say, it is impossible to protect the defendant, on the ground that the adjoining road passed by the deed, as an incident to the lands professedly granted. A mere easement may, without express words, pass as an incident to the principal object of the grant; but it would be absurd, to allow the fee of one piece of land, not mentioned in the deed, to pass as appurtenant to another distinct parcel, which is expressly granted by precise and definite boundaries. And in the case of *Leonard v. White* (7 Mass. 6), it was decided, that by the grant of a grist-mill, with the appurtenances, the soil of a way, immemorially used for the purpose of access to the mill, did not pass; although it might be considered as a grant of the easement, for the accommodation of the mill. (Cro. Eliz. 704; Cro. Car. 57; 3 Salk 40.) The answer, therefore, to this branch of the question, must be, that *the soil and freehold of the streets did not pass under and by virtue of the term "appurtenances,"* * * *. [Emphasis supplied.] [Id. at 54.]

Another argument of the plaintiffs is that even if the United States had title to the alleys when the commissioners sold all of the abutting lots in a square, the United States gave up or lost its title to the alley. We do not agree. This identical question was decided by the Supreme Court of Texas in *Town of Refugio v. Strauch,* 29 S.W.2d 1041 (1930). In that case the town of Refugio received a grant of four leagues of land from Mexico about the year 1834, which was later recognized by the Republic of Texas and thereafter by the State of Texas. The grant was in the form of a square with the town in the center. Lots and streets were laid out. The land in controversy was a street bounded on both sides by 40 acre farm lots. The town sold all these farm lots and the purchasers put a fence around them and the street. The fence was in place for 40 years. Oil and gas was discovered in the area and the street became valuable property. A lawsuit ensued between the town and the purchasers of the

abutting lots, each claiming title to the street. The purchasers claimed that their title went to the middle of the street. The court held against them saying:

* * * The rule is recognized in this state that, when a private individual, as the owner of a lot in a town or city, fronting on a street, conveys a lot, it is presumed that the intent of the grantor was to extend the grant to the middle of the street. This presumption arises out of the necessity of the case, as well as by reason of the fact that the owner of the fee to the street had dedicated the street to public use, but had reserved the fee in himself, subject to the acceptance by the public of the street dedicated. *This presumption, however, does not exist under the facts of this case, since the town of Refugio, a municipality, owns the fee in the land, and has owned it at all times since the sovereign parted with the title. In such a case the presumption is that the grantor intended to keep, and the grantee understood that the grantor was keeping, the fee-simple title.* A presumption cannot arise where the facts themselves are of contrary import. 4 R.C.L. p. 80, 87; *Hardin v. Jordan,* 140 U.S. 371, 397, 398, 11 S.Ct. 838, 35 L.Ed. 428; *Smith v. Slocomb,* 9 Gray (Mass.) 36, 69 Am.Dec. 274; *Lembeck v. Nye,* 47 Ohio St. 336, 24 N.E. 686, 8 L.R.A. 578, 581, 21 Am.St.Rep. 828; *Perry v. Board of Com'rs of Caddo Levee Dist.,* 132 La. 415, 61 So. 511, 514; note in 30 Am.St.Rep. 853, and in 39 Am.St.Rep. 154.

In Ruling Case Law, p. 80, it is said: "The presumption primarily applies to conveyances by individuals. *If a municipal corporation having title to the fee to a street conveys land as bounded on it, the title of the grantee does not impliedly extend to the middle, but is limited to the line of the street, because the legal intendment in such case is that it is to remain a public highway.*" In 9 C.J. p. 204, it is said: "A conveyance by a city of land bounded by a street of which it is the owner in fee, the title thereto being held in trust for street purposes, does not carry title to the center of the street,

there being no presumption as in case of conveyances by individuals that a conveyance of land bounded on a street carries title to the center of the street." In *Graham v. Stern,* 168 N.Y. 517, 61 N.E. 891, 893, 85 Am.St.Rep. 694, it is said: "There is an obvious and a material distinction between the case of a conveyance by an individual of lands bounded upon or by a street and that of a similar conveyance by municipal authorities. The presumption that obtains ordinarily in the one case * * * should be regarded as offset in the other by another presumption,—that the municipality would not part with the ownership and control of a public street once vested in it for the public benefit. * * * It is altogether the sounder proposition * * * that the grant of title to property bounded by or upon a city street, derived from the public authorities, in the absence of any more definite description, carries only to the line of the street." [Emphasis supplied.] [*Id.* at 1045.]

This brings us to the argument of the plaintiffs that the original alleys in Washington were established under the common law by which the title of the owners of the abutting lots extended to the center of the alleys subject to an easement in favor of the United States and that upon their closing the title reverted to the abutting lot owners. This is a correct statement of the common law rule. *See People v. City of Chicago,* 321 Ill. 466, 152 N.E. 141 (Sup. Ct.1926) where this principle is stated as follows:

At common law the dedication of a street or alley passed to the municipality merely an easement. The dedicator still continued to own the fee, subject to the easement. A deed of an abutting lot passed the title to the center of the street or included the entire street, as the case might be, burdened, of course, with the easement. If the street was abandoned or vacated by the municipality the abutting owner continued to hold his title to the center of the street just as he had held it before, but now freed from the easement. * * * [*Id.* 152 N.E. at 144.]

We do not agree that the original alleys in this case were dedicated at common law. When Maryland ceded the land to the United States and the proprietors had conveyed the land in fee simple to the trustees, the sovereignty of Maryland over the land ceased and that of the United States attached. The common law no longer controlled or even applied to the establishment of the alleys. The rule announced in the *Town of Refugio* case and the authorities therein cited is the correct one, namely, that where the city has title to the streets and alleys, the title of the owners of the abutting lots extends only to the line of the streets and alleys and not to the center thereof. In the *Van Ness* case, the Supreme Court at 284 distinguished between the laying out of the original streets in Washington and the common law dedication in *Railroad Company v. Schurmeir,* 74 U.S. (7 Wall.) 272 (1868). The United States (in the instant cases) continued to own the fee in the street and alleys to the dates of their closings.

The plaintiffs argue that this is inconsistent with the provision of the statute cited below that allows the owner or owners of an *entire square* to replat the square and rearrange the alley. The plaintiffs say this could not be done if the United States owns the fee in the alley. We do not agree. Congress has taken care of this situation by requiring the replatting of the square and the new alley and requiring the new plat to be submitted to and approved by the city council, and thereafter recorded. Under these circumstances, the original alley is replaced by a new alley with the approval of the United States and "the *proprietary interest of the United States* shall forever cease and determine and the title to the same shall be vested according to the agreement of the owners as shown in the aforesaid plat * * *." (D.C. Code § 7–307). Thereafter the United States is estopped to assert ownership of the original alley in the square. In the cases before us, the plaintiffs are not the owners of entire squares. They own only a few of the lots in the squares. For instance, the plaintiff Metropolitan Club of the City of Washington owns only two lots out of square 166 which originally contained 27 lots.

The case of *Pratt v. Law,* 13 U.S. (9 Cranch) 456, 3 L.Ed. 791 (1815) is very much in point here and is dispositive against the plaintiffs' claim of fee simple title to the alleys in the present cases. In that case, plaintiff Law contracted to purchase 2,400,-000 square feet in the Federal City of Washington. His vendors attempted to charge him for square footage in alleys in squares in which the entire squares were not conveyed to him. Law refused to pay for the square footage in the alleys and the matter was taken to court. The Supreme Court agreed with Law, saying:

* * * If this claim of Law's extended to the alleys in those squares of which the whole was conveyed to him, there would be some ground for disputing it. But as it is confined to those squares only in which the right could not be merged, because some one or more of the lots were the property of another, we think the allowance ought to be made; *for Law certainly has not acquired a title in fee simple in those alleys.* [Emphasis supplied.] [*Id.* at 490.]

The plaintiffs in the instant cases are in the same situation that Law was in as far as title to the alleys is concerned, because they own only a few lots in their respective squares, and in the language of the Supreme Court they "certainly have not acquired a title in fee simple in those alleys."

Mention should be made of the case of *Bursey v. Lyon,* 30 App.D.C. 597 (1908). In that case the Supreme Court of the District of Columbia held, with reference to the title of the United States in the streets and alleys in the Federal City of Washington:

* * * The foundation of the government's *title to so much of the real estate as was ultimately dedicated to streets, alleys,* or public grounds rested upon contract with the individual proprietors. *As to this portion of the ceded territory, title in the soil became vested in fee simple in the United States.* * * * [Emphasis supplied.] [*Id.* at 605.]

The court held further:

At this point it is proper to consider whether the legal title to the land here in controversy ever passed to the United States. *The streets, alleys,* and lands selected by the President for public purposes, for which the grantors were to be paid at the rate of twenty-five pounds per acre, by the terms of the deeds of trust and the agreement *became vested in the United States in fee simple,* as soon as the same were selected, set apart, and apportioned by the commissioners. As to the lands so embraced, the executory agreement, and the deed of trust made in pursuance thereof, were no longer executory, but became final and complete. * * * [Emphasis supplied.] [*Id.* at 607–08.].

We have a clear-cut holding by the court in that case that the title to the streets and alleys vested in fee simple in the United States. We are in total agreement with such decision by that court.

We held in *Calvin-Humphrey Corp. v. United States,* 480 F.2d 1323, 202 Ct.Cl. 519 (1973), that the title to an original alley closed in that case was in the United States. Of course, in that case all parties assumed this to be true and no one raised any question as to the title of the United States in the alley. This was in keeping with the understanding and belief of the general public and of the Congress since 1791.

It is significant that the court in *Carr v. District of Columbia,* 371 F.Supp. 293 (D.D.C.1974), *aff'd and remanded for modification* (September 3, 1975, without opinion), 172 U.S.App.D.C. 224, 521 F.2d 324 (1975), (a slip opinion was filed August 18, 1976), in considering the closing of an original alley in Washington, D. C., repeatedly characterized it as property of the United States. For instance, it stated:

* * * The entire portion of the alley space to be closed was an original alley *owned by the United States.*

* * * * * *

* * * [P]laintiffs were ordered to pay to the Treasury of the United States the sum of $196,200.00 representing the fair market value of *the United States prop-*erty *to be closed.* * * * [Emphasis supplied.] [*Id.* at 295.]

In the conclusions of law the court held:

The District of Columbia City Council and its members are authorized to close *United States alleys* in the District of Columbia * * *.

Any money received by the District of Columbia for the sale of closed alley space *owned by the United States* must be deposited by the District in the United States Treasury * * *.

* * * * * *

* * * Congress has delegated to the District of Columbia complete authority to close *United States alleys.* [Emphasis supplied.] [*Id.* at 296.]

* * * * * *

When the District of Columbia pursuant to D.C. Code § 7–401, * * *, determines that a *United States alley* is useless and unnecessary and decides to close it, *title to the alley does not automatically revert to the owners of the property abutting the area to be closed.* * * *

* * * * * *

When closing *original United States* property * * * the District of Columbia City Council may, for the account of the United States, charge abutting property owners the fair market value of the space closed. Section 7–401 *distinguishes between United States and District of Columbia land* and gives the City Council express authority to charge for *United States property.* * * * Because this case involves *an original United States alley* * * *. [Emphasis supplied.] [*Id.* at 297.]

The D.C. Circuit Court of Appeals affirmed the findings of fact and conclusions of law in 521 F.2d 324, and in its slip opinion of August 18, 1976. The foregoing cases support our conclusion that the fee simple title in the original street and alleys was vested in the United States at the time of the closings involved in this case.

■ The Congress in enacting various laws through the years for the closing,

straightening, widening, sale, etc. of alleys in the city of Washington, has recognized and carefully preserved the difference between alleys owned in fee simple by the United States and common law alleys dedicated by developers or abutting property owners which are owned by the District of Columbia. This distinction was pointed out by the court in *Carr v. District of Columbia,* 371 F.Supp. 293, 297 quoted above. In describing the alleys owned by the United States in these laws, the Congress sometimes referred to them as "original alley, the fee of which is in the United States," (the Act of 1892, §§ 1, 3; the Act of 1901, §§ 1608, 1610) and sometimes described them simply as "original alleys," (the Act of 1905, §§ 1608a, 1608b and D.C. Code §§ 7–302, 7–303). We conclude that these terms are used interchangeably and have the same meaning and that when Congress referred to or described an alley as an "original alley" in the various laws dealing with the closing and sale of alleys (including the various sections of the present D.C. Code) it was the intent and purpose of Congress to refer to and describe alleys that were originally laid out in the city of Washington in which the fee simple title was vested in the United States. The parties in the instant cases have agreed that the alleys involved here are "original alleys."

The various laws passed by the Congress dealing with the closing, sale, etc., of alleys in the city of Washington, as listed by the plaintiffs, are the following:

By Act of January 12, 1809, 2 Stat. 511, Ch. VIII, Congress authorized the proprietors of squares and lots in the city of Washington to subdivide squares or lots, and alleys, into "building lots, pieces or portions for sale and occupancy." Such authorization included the right to relocate "ways, alleys, or passages." The same Act authorized the President of the United States to subdivide squares or lots belonging to the United States, "which may not have been reserved for public purposes," into "lots, pieces or portions for sale and occupancy and alleys for their accommodation." The provisions of this Act of 1809 are contained

substantially in the subsequent Act of March 3, 1901, 31 Stat. 1426, Ch. 854 as set forth in Section 1–612, *et seq.,* D.C. Code (1973). *See United States ex rel. Case v. Forsyth,* 5 Mackey 483 (1887). In 1848 (9 Stat. 223, Sec. 2, 30th Congress, 1st Sess. 1, Chapter 42), Congress added a new provision permitting the corporation of Washington "to cause new alleys to be opened into squares, and to open, change or close those already laid out, upon the application of the owners of more than one-half of the property in such squares * * *." *See Webb's Digest* 1 (1868).

By Act of July 6, 1882 (22 Stat. 151, 47th Cong., 1st Sess., Ch. 271–273), Congress authorized the closing of alleys upon petition of the owners of an entire square or owners of a part of a square bounded on all sides by public streets if those owners offered to the commissioners of the District of Columbia in the petition to dedicate for public use an amount of ground at least equal to the area of the alleyway sought to be closed. This section is essentially the same as the provisions now contained in § 7–306, D.C. Code (1973).

Congress, in 1892 (27 Stat. 255, 52d Cong., Sess. 1, Sec. 1) authorized the commissioners to:

* * * [C]ondemn, open, extend, widen or straighten alleys in the District of Columbia * * * [upon] petition of the owners of more than one-half of the real estate in the square * * * or when the Commissioners * * * shall certify that the preservation of peace, good order, and public morals require that any such alley should be opened, extended, widened or straightened; or when the health officer of the District shall certify that the opening, extension, widening or straightening of an alley is necessary for public health * * *.

The first portion of Section 1 of the Act of July 22, 1892, is essentially the same as the provision now contained in § 7–301 dealing with the condemnation for alleys and minor streets. Under the second portion of Section 1 and companion Section 3 of that Act (which is essentially the same as

§ 7–302 D.C. Code (1973)), Congress provided that, if in the opening, extension, widening or straightening of an alley by condemnation as provided in Section 1 of the Act, the commissioners had authority to close any *"original alley"* or part of such alley rendered,

> * * * [U]seless or unnecessary, the fee to which is in the United States, by entering into an agreement with the owners of the lots or parts of lots contiguous thereto for the purchase by them of the land contained in said alley sought to be closed, at a price to be agreed upon * * * which price shall not be less per square foot than the assessed value per square foot of the contiguous lots * *.

Also in Section 3, Congress provided that the commissioners could sell and convey such land, *the fee to which is in the United States,* in the alley to be closed for cash to any person or persons. The commissioners were also authorized, in connection with the condemnation for alleys, "to close an alley, or part of an alley, *the fee to which is not in the United States,"* upon petition of the owners of all lots or parts of the lots abutting thereon. Section 9 of the Act provided that, "If any moneys from the sale of land in which the United States is interested shall remain after carrying out the provisions of the act, the moneys shall be paid into the Treasury of the United States by the Commissioners of the District of Columbia."

In 1901, Congress consolidated and added provisions pertaining to the opening, closing and rearrangement of alleys within the District of Columbia. 31 Stat. 1426, 57th Cong., 2d Sess., Ch. 854, March 3, 1901. In §§ 1605 and 1606, Congress reenacted the provisions concerning the closing of alleys whenever all the owners of an entire square or all the owners of part of a square bounded on all sides by public streets petitioned the District of Columbia for closing (see § 7–306 and § 7–307, D.C. Code (1973)). Section 1607 of the same Act provided for the obliteration of subdivisions and alleys on petition of the owner of an entire square

where the owner or owners desire to improve the square by the erection of a building covering not less than two-thirds of the area thereof for the purpose of some business enterprise. This subsection is now embodied in § 7–308, D.C. Code (1973). The first part of Section 1608 is essentially the same as the 1892 Act, except that it also provided for opening, extension, widening and straightening minor streets and provided for the closing of alleys the width of which is less than 10 feet. The second portion of Section 1608 provided for the sale of the alley areas closed in connection with the opening and extension *if the fee title to the land* or part thereof was in the United States. The section with regard to alleys less than 10 feet in width is now contained in § 7–304, D.C. Code (1973). Section 1610 also restates the provisions of the Act of 1892 with regard to closing of alleys *not titled in the United States* rendered useless or unnecessary by the opening, extension, widening or straightening of an alley or minor street as provided in the Act.

By Act of 1905 (58th Cong., Sess. 3, Ch. 734, 33 Stat. 733) Congress again amended the Code of Laws for the District of Columbia and consolidated and added provisions concerning the opening and closing of alleys. These provisions have remained substantially unchanged to date. Sections 1608 and 1608a were essentially the same, except that the qualifying words *"the fee of which is in the United States"* contained in the *Act of 1892 and Act of 1901 were omitted after or replaced by the words "original alleys."* These two companion provisions relating to condemnation for alleys and minor streets now comprise § 7–301 and § 7–302, D.C. Code (1973).

Section 1608b relating to closing alleys upon dedication of others, was added for the first time by the Act of 1905. This provision is the same as § 7–303 D.C. Code. Under Section 1608b, the commissioners were authorized *for the first time* to accept the *dedication* of an alley or alleys and, in connection therewith, to close any existing alley or alleys in the square in which the dedication is made upon the application of

the *owners of all the property abutting upon such existing alley or alleys.* If the alley were an *"original alley,"* the parties were to enter into a mutual agreement in writing under seal as to the disposition of the ownership of the land contained in the alleys. Upon recordation of the required plats, the *original alley* or portions thereof vested in the parties whose names appeared on the plat.

The other provisions of the 1905 Act incorporated previous Acts of Congress. For example, Section 1608c incorporated the provisions of the 1901 Act relating to alleys less than 10 feet in width and Section 1608d incorporated the provisions of the 1901 Act concerning the closing of alleys in squares owned by one person or partners where there was a desire to construct a building covering not less than two-thirds of the area thereof. Section 1611 (the same as § 7–325, D.C. Code (1973)) provided that "All money derived from the sale of land in which the United States is interested, under the provisions of this Act, shall be paid into the Treasury of the United States by the Commissioners of the District of Columbia to the credit of the United States."

On December 15, 1932, Congress adopted the Street Readjustment Act (47 Stat. 747, Ch. 4, § 1 *et seq.*) which provided for the closing of streets, roads, highways or alleys or parts thereof in the District of Columbia, or the sale thereof under § 7–302, when, in the judgment of the commissioners, the street, road, highway or alley or part thereof, is rendered "useless or unnecessary" upon certain conditions. See, § 7–401, *et seq.*, D.C. Code (1973). As indicated in the Street Readjustment Act (§ 7–409), the provisions of the Act *were in addition* to the laws already in existence which provided for the closing of streets, roads, highways or alleys. It provided in § 7–409 that all existing laws authorizing the closing of streets, roads, highways, or alleys were to remain in full force and effect.

At the times the alleys and the street were closed in these cases, the council was authorized to close them under Sections 7–302, 7–303, 7–304, 7–305, 7–306, 7–308, and 7–309 of Title VII, Chapter 3, *Alleys and Minor Streets,* D.C. Code (1973), and Sections 7–401 through 7–410 of Chapter 4, *Closing Streets, Alleys, or Highways* (The Street Readjustment Act of 1932). The alleys that were closed upon the applications of plaintiffs Washington Medical Center, Inc., and The Metropolitan Club of the City of Washington were closed by resolutions of the council that recited that they were being closed pursuant to Section 7–303, as both plaintiffs were dedicating small areas for new alley spaces in addition to requesting portions of the original alleys to be closed under § 7–303, D.C. Code, which provides as follows:

§ 7–303. Alleys may be closed on dedication of new ones—Application of property owners—Future ownership of closed alleys—Plats recorded

The said commissioners are authorized to accept the dedication of an alley or alleys and in connection therewith to close any existing alley or alleys in the square or block in which such dedication is made upon the application of the owners of all the property abutting on such existing alley or alleys. *If the alley proposed to be closed is an original alley,* the party or parties making the dedication and the parties applying for the closing of the alley or alleys shall present with such application a mutual agreement in writing and under seal, in duplicate, as to the future ownership of the land contained in the alley or alleys to be closed, together with two plats showing the alley or alleys divided into parcels, with the name of the future owner marked on each parcel, in accordance with such agreement. Copies of the order of the commissioners accepting the dedication and closing the original or subdivisional alley, together with the said agreements and plats in the case of an original alley, shall be forwarded by said commissioners to the surveyor and recorder of deeds of the District of Columbia for record, and thereafter the title to the land in such subdivisional alley shall revert to the owners of the land abutting thereon, and the title to the land in the original alley shall vest in the

parties whose names appear on said plat in accordance with said agreement. Mar. 3, 1901, ch. 854, § 1608b, as added Feb. 23, 1905, ch. 734, 33 Stat. 733. [Emphasis supplied.]

■ The plaintiffs argue that Section 7–303 nowhere provides for the charging of money or assessment against the plaintiffs for the closing of the alleys, and therefore, the money exacted from them by the council for such closings was done without authority and was accordingly illegal. They contend further that Section 7–302, which does authorize the collection of money by the council for closing original alleys, cannot be looked to nor relied on to sustain the action of the council, because Section 7–303 does not refer to Section 7–302, and the sections of the Code are separate and mutually exclusive of each other and cannot be considered together. We do not agree. This identical point was decided by us adverse to the plaintiffs' position in our opinion in *Calvin-Humphrey Corp. v. United States, supra,* where we held:

> \* \* \* It appears that although the Council only referred to section 303 in its resolution closing the alley and accepting the dedication of the new alley, *it was proceeding at the same time under all the other provisions of the Code which authorized it to collect money for the United States for the closing of an "original" alley, the title to which was in the United States.* That is what was done in this case and the money was paid into the Treasury of the Government. This appears to be in full conformance and compliance with the provisions of the various sections of the Code mentioned above. [Emphasis supplied.] [480 F.2d at 1325, 202 Ct.Cl. at 524.]

In *Carr v. District of Columbia,* 371 F.Supp. 293, 297, *supra,* the court made a similar ruling in construing Section 7–401, saying:

> The options afforded the District of Columbia by Section 7–401 in dealing with United States property *are not mutually exclusive.* [Emphasis supplied.]

Even in the first *Carr* case (*Carr v. District of Columbia,* 312 F.Supp. 283 (D.D.C. 1970)) relied on heavily by the plaintiffs in this case, although it involves the closing of a non-original alley and is inapposite here on the merits, (as it was in the *Calvin-Humphrey* case), Judge John J. Sirica stated in construing Section 7–401, D.C. Code:

> \* \* \* When *all* of the relevant sections of the statute *are read* together it appears that the intention of Congress in enacting the statute was that \* \* \*. [Emphasis supplied.] [*Id.* at 285.]

The fact that the council in the instant cases referred to Section 7–303 did not prevent it from requiring the payment of money for the alley closings under Section 7–302 which provides:

> § 7–302. Useless alleys—Sale of original alleys—Reversion of title to owner

If in the opening, extension, widening, or straightening of an alley or minor street, or in the extension or widening of public streets or highways, an alley or part of an alley may have been, or may hereafter be, in the judgment of the said commissioners rendered useless or unnecessary said commissioners are authorized to close the same. *If the alley to be closed is an original alley, they may sell the land contained therein for cash at a price not less than the assessed value of contiguous lots.* If the alley is not an original alley, the title thereto shall revert to the owners of the land abutting thereon, but all such land shall be subject to the assessment for benefits hereinafter referred to. Mar. 3, 1901, ch. 854, § 1608a, as added Feb. 23, 1905, ch. 734, 33 Stat. 734. [Emphasis supplied.]

It should be pointed out that Section 7–304 refers to Section 7–302 as follows:

> § 7–304. Closing narrow alleys—Application of property owners—Disposal of land

The commissioners are authorized to close any alley or part of alley the width of which is less than ten feet upon the application in writing of the owners of all the abutting property. *If the title to such closed alley is in the United States, the*

*land shall be sold, as provided in section 7–302;* and if the title is not in the United States, the land shall revert as provided in said section. Mar. 3, 1901, ch. 854, § 1608c, as added Feb. 23, 1905, ch. 734, 33 Stat. 734. [Emphasis supplied.]

Also, Section 7–401 in listing the various options available to the council in disposing of closed original alleys, provides:

\* \* \* [O]r also said property be sold as provided in section 7–302 this title, \* \* \*.

Finally, Section 7–325 provides:

§ 7–325. Proceeds of sale of lands paid into Treasury

All money derived from the sale of land in which the United States is interested, under the provisions of sections 7–301 to 7–308, 7–313 to 7–318, 7–320, 7–321, 7–323, 7–325 to 7–330 shall be paid into the treasury of the United States by the commissioners of the District of Columbia to the credit of the United States.

It is clear from these various sections of the D.C. Code that refer to each other, and especially Section 7–325 above which refers to all of the principal sections involved in these cases, except Section 7–401 (which itself refers to Section 7–302), that Congress intended that all of these sections must be considered together and in the conjunctive and not disjunctive as plaintiffs contend.

Accordingly, we hold that all of the sections of the D.C. Code listed above must be considered together and in conjunction with each other, and that they are not mutually exclusive. The authority and power granted in one section extends to and applies to each of the other sections.

The council closed the street and alleys described in the petitions of the plaintiffs 1776 K Street Associates, D. F. Antonelli, Jr., and Jack Kogok, under Sections 7–401, *et seq.* of the D.C. Code. Section 7–401 as follows:

§ 7–401. Street Readjustment—Closing of unnecessary public ways authorized—Disposition of property—Reference to Planning Commission

The Commissioners of the District of Columbia are authorized to close any street, road, highway, or alley, or any part of any street, road, highway, or alley, in the District of Columbia when, in the judgment of said commissioners, such street, road, highway, or alley, or such part of a street, road, highway, or alley, has been rendered useless or unnecessary, the title to the land embraced within the public space so closed to revert to the owners of the abutting property subject to such compensation therefor in money, land or structures as the commissioners of the District of Columbia, in their judgment, may find just and equitable, in view of all the circumstances of the case affecting near-by property of abutters and/or nonabutters: *Provided, That if the title to such land be in the United States the property shall not revert to the owners of the abutting property* but may be disposed of by the said commissioners to the best advantage of the locality and the properties therein and thereby affected, which properties thenceforth shall become assessable on the books of the tax assessor of the District of Columbia in all respects as other private property in the District; *or also said property be sold as provided in section 7–302 this title,* unless the use of such land is requested by some other department, bureau, or commission of the government of the United States for purposes not otherwise inconsistent with the proper development of the District of Columbia: *Provided further,* That the said closing by said commissioners is made expedient or advisable by reason of change in the highway plan or by reason of provision for access or better access to the abutting or nearby property and the convenience of the public by other street, road, highway, or alley facilities, or by reason of the acquisition by the District of Columbia or by the United States of America for school, park, playground, or other public purposes, of all the property abutting on the street, road, highway, or alley, or part of a street, road, highway, or alley, proposed to be closed or for other public reasons: *And provided fur-*

*ther,* That the proposed closing of any street, road, highway, or alley, or any parts thereof, as provided for in this chapter shall be referred to the National Capital Planning Commission for its recommendation. Dec. 15, 1932, ch. 4, § 1, 47 Stat. 747. [Emphasis supplied.]

These three plaintiffs say that the council closed the street and alleys under this section of the Code for "the best advantage of the locality" and argue that it did not have the authority at the same time to collect money for the closings notwithstanding the fact that Section 7–401 specifically states that the property may be "sold as provided in section 7–302," which authorizes the council to require the payment of money when streets or alleys owned by the United States are closed or sold. The plaintiffs contend that these provisions are mutually exclusive. These arguments are without merit. We rejected them in the foregoing paragraphs and we reject them again here. The court's decision in the second *Carr* case (371 F.Supp. 293, 297) ruled against plaintiffs' theory in construing this identical section by holding, as pointed out above, that the options in Section 7–401 are "not mutually exclusive." Our holding in the *Calvin-Humphrey* case is to the same effect. Also, as pointed out above, in the first *Carr* case (312 F.Supp. 283) Judge Sirica, in construing the Street Readjustment Act, of which Section 7–401 is a part, held that all of the relevant sections of the statute should be read together.

These three plaintiffs, along with the other two, urge the proposition that the decision in the first *Carr* case (312 F.Supp. 283) that the council could not charge for closing non-original alleys owned by the District of Columbia should also be applied to the closing of the original street and the original alleys in the *instant cases in which the fee simple title is vested in the United States.* We rejected this contention in *Calvin-Humphrey* and we reject it again here. The law with respect to the closing of a common law dedicated non-original street or alley is not applicable to the closing of original streets and alleys owned by the United States.

All of the plaintiffs say that even if the United States owned the fee in the street and alleys, it only had a nominal value and that the findings of the council of the fair market value of the streets and alleys closed and sold under Section 7–302 were far in excess of nominal value and therefore the collection of the respective sums from the plaintiffs was illegal. The short answer to this argument is that the street and alleys were owned by the United States, who did not have to close or sell them. As Government property, it could be sold for whatever price the Congress authorized. In Section 7–302 the Congress fixed the selling price of original streets and alleys "at a price not less than the assessed value of contiguous lots." The council determined these values in accordance with this directive, the plaintiffs agreed to them and willingly paid the amounts found by the council to be due, and without protest of any kind to the council. It is too late for the plaintiffs to protest these values for the first time in this court. *See United States v. Tucker Truck Lines, Inc.,* 344 U.S. 33, 36–37, 73 S.Ct. 67, 97 L.Ed. 54 (1952); *McClung v. Thompson,* 401 F.2d 253, 257 (8th Cir. 1968); and *California Interstate Telephone Co. v. Federal Communications Commission,* 117 U.S.App.D.C. 255, 328 F.2d 556, 559 (1964). It is hardly possible that the council erred in determining the assessed value of the contiguous lots, as these values are a matter of public record. But even if there were errors, the plaintiffs should have complained about them to the council at the time the errors were made. We cannot consider errors not brought to the attention of the council. Besides, the plaintiffs have not shown any errors made by the council as to the assessed values of the contiguous lots, or the application thereof to the street and alleys involved here, in any of their pleadings, briefs, or other papers filed in this court.

We reject plaintiffs nominal value theory. To support this theory, they say (1) that the United States only had easements and not title, and (2) the rule as to value in condemnation cases should be applied here.

They cite *United States v. Chandler-Dunbar Water Power Co.,* 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); and *Fitzhugh v. United States,* 59 App.D.C. 285, 40 F.2d 797 (1930), in support of their second argument. These are condemnation cases. We do not agree with either of plaintiffs' propositions. We have already held that the United States had fee simple title to the street and alleys and not mere easements. The rule as to value in condemnation cases does not apply to the sale of original streets and alleys in which the fee simple title is vested in the United States and the Congress has fixed the selling price by statute, which is the situation in the instant cases. Consequently, the cited condemnation cases are inapposite.

■ The plaintiffs say that prior to 1967 the council did not require the payment of money for the closing of non-original or original alleys in the city of Washington and the sale thereof to abutting property owners, but in that year it started charging for such closings and sales. The plaintiffs complain that this was done without notice to the public and that their due process rights were violated. The plaintiffs are in no position to make such an argument. Each of them had full notice from the council that money was required to be paid for the closings and the amount to be paid. After receiving this notice, each plaintiff agreed to pay the amount required by the council and paid it voluntarily with full notice and knowledge as to the charges being made. Nothing was taken from the plaintiffs in violation of due process, as all of the transactions were completed by agreements of the plaintiffs with the council. Furthermore, no objections were made by plaintiffs to the council as to the lack of public notice at the time the charges were made, and we cannot consider them at this late date.

■ Finally, the plaintiffs Antonelli and Kogok allege in their petitions that the D.C. Administrative Procedure Act became effective on October 21, 1969, and that Section 1–1507, D.C. Code (1973) required the council to compile rules and regulations for the closing of streets and alleys and that this had not been done. No proof was offered of these facts. The petition of plaintiff 1776 K Street Associates does not contain any such allegation, but in its brief it makes the same argument. The closings of the street and alleys for these three plaintiffs were made by the council after the effective date of the D.C. Administrative Procedure Act. None of these plaintiffs show how the failure of the council to compile such rules and regulations, if the council so failed, affected their claims or rights in the instant case. They simply say that the failure of the council to compile such rules and regulations was a violation of the Administrative Procedure Act. Even if the council did violate the Act in this regard, which was not proven, such violation is of no help to these plaintiffs without allegations and proof on their part that such a violation denied them a right to which they were entitled under the law. The record is totally lacking as to any such allegations or proof. Under these circumstances, we regard this contention of these plaintiffs to be irrelevant and immaterial to any issue in their cases. Furthermore, even if the council was required to compile such rules and regulations by the Administrative Procedure Act and failed to so do, such failure could not have the effect of overruling and rendering a statute enacted by Congress unenforceable. Section 7–302 of the Act of Congress described above specifically authorized original streets and alleys to be closed and sold and charges made therefor. The mere failure of the council to compile rules under the Administrative Procedure Act could not change nor supersede this statute. We conclude that this argument of these plaintiffs is without merit.

We hold that the United States had fee simple title to original G Street, N.W., and to the original alleys involved in these cases, portions of which were closed and sold by the D.C. Council as agent of the United States to the respective plaintiffs, and that the council was fully authorized by statutes enacted by Congress to make such closings and sales and to charge and collect

the amount of the fair market value thereof, as determined by the council, from the plaintiffs in accordance with the statutes, and that by reasons thereof the plaintiffs are not entitled to recover.

Accordingly, the joint motion for summary judgment of the plaintiffs is denied, the motion and cross-motions for summary judgment of the defendant are granted, and plaintiffs' petitions are dismissed.